Mr. Peters, I guess. Good morning, Your Honors, and I would like to reserve 5 minutes for rebuttal. I'm sorry, I can't hear you too well. But I would like to reserve 5 minutes for rebuttal, and I will attempt to remember that. Your Honor, this case is ---- Maybe try to pull the mic up. I don't know how much it will come up, but a little bit maybe. Yes, I tend to speak softly. I have to remember to keep my volume up. This case is fallout from the tech industry crash of the late 1990s, early part of this millennium. This case relates to that period's times of promises, great and perhaps unreasonable expectations, and inevitable disappointments. In this case, there was what could be called a perfect storm leading to a preposterously unfair trial for Mr. Bhatia. And there are three main issues that resulted in that unfair trial. The first issue relates to the government's seizure. You were looking as if you were about to form a question. No, no, I didn't have a question. It is a little hard to hear you, so keep trying. Okay. Thank you. The first question really related to the government's seizure of Mr. Bhatia's computers in an unrelated criminal case. And that was an issue that swirled in the background for more than a year in this case and was really never resolved by the district court. That issue had two elements to it. One was the fact that the computers, when they were returned, were apparently unreadable to some extent. And the second issue related to the government's ultimate viewing of those computers, despite a claim of attorney work product and attorney-client privilege on those computers. And I think if you take a look at the one of the documents that is attached to the government's excerpt of record, you can see what the basis of that privilege claim was. It was basically not that the documents themselves were privileged, but that they revealed that the defense strategy they had been placed in order through the use of litigation. Well, essentially Judge Wilkin decided that you just hadn't proved that up, as I understand it. That she kept saying, show me what you're talking about, and she just simply wasn't satisfied that you showed her any such order or anything that was privileged. Well, I think if you take a look at the document that is attached to the government's excerpt of record, I believe it's around 80, which is about a 30-page summary, showing multiple documents attached in order with captions, that shows you what they were talking about, that the documents had, in fact, been arranged so that they would be available for trial counsel to consider and to use at the trial. And I think... But what is our standard of review in terms of reviewing the district court judge's ruling? I think it would be an abuse of discretion issue. So how can you establish abuse of discretion by looking at the attachments to the government's excerpts of record? Well, actually, let me think about that for a moment. Because on the claim of privilege, I guess it would actually be a de novo review as to whether it appears that those documents were, in fact, privileged, and whether the government interfered with trial preparation and took improper advantage of its incursion into Mr. Bhatti's computer. So actually, I don't think it's abuse of discretion. I would see that as a de novo issue, because the court can look at those documents and see whether, in fact, it appears to be attorney work product. Now, what case authority are you relying on to support your argument regarding the standard of review in reviewing the district court's determination? I think that would just be the general issue of whether it is a, as opposed to a standard evidentiary, standard of review would be a privileged standard of review, which I believe would be a de novo review by this Court. I don't think the trial court has discretion to either admit or not admit privileged documents. And therefore, I think the court would have to take a look at it as a matter of law as to whether those documents were privileged. You know, one way of looking at this, the documents themselves, it would seem, ought to be discoverable, because what you're really complaining about was the way in which they were organized for the attorney to look at? Yes, that is correct. There is no claim that the documents themselves are privileged. They are ordinary work documents. However, it is the organization of those documents for purposes of trial, and there are cases that hold that as to be work product or attorney client, that, in fact, when the government looks at those documents and looks at the organization of them and looks at the captioning under which they are organized, the government now understands what the defense is going to do and how it's going to attempt to do that. Now, what theory did the defense counsel have that could be shown to have been disclosed by this order that the documents were in? The primary claim was that it showed that there was going to be a defense that this was, in fact, a legitimate business, that it had ordinary business operations, that it had clients, that it had ordinary expenses, and that it was, in fact, a legitimate business as opposed to a de facto tool for defrauding the investors. Now, wouldn't that theory be revealed in the trial brief, or just somehow one would know that that would be his defense? That is true. At some point you would know that, whether you would know it months in advance by looking at somebody's computers and whether you would know the specific documents that were going to be used to prove those specific elements is another issue. You know, if on that computer there had been some very private communications from the client to the lawyer, I'd have a lot better understanding of the defense that you're making. But there wasn't anything like that on the computer, apparently. No, but there was a second element to that, which was that the government, through its handling of those computers, apparently damaged them, and that made the data that was on them unavailable to Mr. Batya. I thought they then copied them in some way that it was then available at that point. I'm not sure that it ever was. That's what I understand, not what the record says, that they then cloned them in some way that then the material was accessible? It seems like it was, but what the after effect was of this is that I think it essentially paralyzed the defense. And there's continuing conversations all the way through, I think, October of 2005, about these documents, and it's apparent that one effect of this was essentially that Mr. Rapoport, who was supposed to be the lead trial attorney, failed to prepare for trial. And that sort of intermingles with the other issues here, which is that the lawyer Let me ask one other question about this. In their reply brief, and this is the first time I remember it showing up, you mentioned something called a fact chronology and issue summary. What is that? That's what I was referring to. It's in the government's excerpt of record, I believe, at around page 80. That's where they have taken what was an attachment to, I believe, Ms. Kapoor's declaration, and they've provided for the court. That was basically the organization, or at least a summary of part of the organization of the documents into trial preparation. So that's what I'm referring to. So on the computer there was something called fact chronology and issue summary? I'm not sure if that's the exact title, but that's what it was. It was the organization of the documents by use of litigation software, so I think it might have been summation, to prepare the documents, to identify the theory of the documents, and to put them into some organization. But that's something more than simply the way the documents appear on the computer, so I don't understand why you're not making more of that. I don't have it in front of me, so I can't look and see what it is. I'm not going to be making more of it because I'm trying to deal with the other issues. Counsel, before we leave that issue, the government's witness list, before the government reviewed the computer files, did it contain witnesses that would be expected to challenge the legitimacy of the business? I don't believe it did, and not to the extent I know that several witnesses were added, including Mr. King, who was, I believe, the attorney, and several employees were added to the witness list to rebut the claim that it was a legitimate business. How about Mr. Camelucci of the IRS? Well, he wouldn't have been involved because his testimony at trial really related to the money laundering issue only, so I don't think that would have been the result of anything. What about the custodian of records from the SEC? I don't think that would have been related to it also because that would have related directly to the investor's claims that Mr. Bakke represented. There were SEC proceedings ongoing, so I don't see that as being connected. Well, that would refute his assertion that the company was being purchased by these other companies, wouldn't it? Well, I think you have two phases to what happened here. I think you have the initial conversations, promises, and expectations about what these investors would get, and I think these investors had incredibly unrealistic expectations. I believe Mr. Mytha testified that he expected that within four months or three months, $40,000 would turn into $3 or $4 million. That's what he was told, though. Well, I want to deal with that as whether anybody could have said that and anybody could have believed that. There's really two phases here. One is the initial representations, and two are the documents that occurred later when there's pressure from the investors to get the money back. And I think it's phase two where you have the documents which appear to be less than honest, and I think those documents really relate more to sort of overwhelming guilt and shame over the fact that the investors weren't going to get everything back that they wanted. But I did want to go back to where I was starting, which was there were the government, the district court knew that all defense counsel were unprepared. There were repeated statements by Mr. Rapoport at the proceedings on October 3rd. Mr. Rapoport said, I am pretty much in the dark without looking at those documents. On October 14th, Mr. Rapoport said that it was absolutely impossible to get ready for trial. He hadn't had an opportunity to review the documents. On October 24th, Mr. Rapoport said, I haven't personally seen any of the documents. And the reason why he couldn't see the documents was because the government ---- No, I think that really relates more to a related issue. I think what happened here is you had a division of labor between Attorney Sunita Kapur, who was involved with the computer issues, and Mr. Rapoport, who was given a rather impressive fixed-fee retainer to represent Mr. Bhatia, a six-figure retainer, more than six-figure retainer. And Mr. Rapoport essentially did nothing. You get all the way to ---- So when he said he couldn't see the documents, it wasn't true. He just didn't see the documents. Well, I don't know if it's not true, but he certainly didn't. Well, counsel, wouldn't it be better if we could review this claim on habeas as opposed to direct appeal so we could ascertain exactly what the basis ---- Except that it is so apparent in this case what happened at trial. Mr. Rapoport was allowed to withdraw. You had a very junior attorney who came in in his place. That very junior attorney had no ability to deal with the complexity of this trial. Let me just ---- But as I understand it, I mean, there's sort of two pieces of a claim to ineffectiveness. One is Rapoport, and the other is his replacements. Yes. So at least as to Rapoport, we'd have to know more about what happened before he was replaced. I'm not sure if I could point, Your Honor, to a statement made at the January 23, 2006 hearing. Ms. Kapur says, The reason that we have run into this difficult situation is that the preparation that was to have been performed by Mr. Rapoport was not performed. Well, that's what they say, whether that's true or not. And if you take a look at the trial, it is obvious there was no preparation. There were no experts. There were no exhibit lists. There was essentially no defense presented at the trial. It was a pure chaotic situation. Let me just deal with that in another way, too, the failure to really deal with what happened at trial. Preparing for ---- Another possibility is that there was no viable defense. That's possible. Let me just point out a couple of things. And that's what we might find out if we ---- if there were a hearing on a 2255, that the reason why nothing happened is there was no viable defense. Well, yes. Or no experts because there was nothing an expert could have said that would have been helpful. Or they tried to get an expert, and no expert could give them the opinion that would be helpful to the defense. Well, how many different continuances ---- there were several continuances. Were any of them asked for by the government? The government agreed to several of them, specifically ---- But they didn't initiate any requests. No. So how many continuances were there? There were about four or five. Most of them related to the indictment in the other case. And this computer issue. The only one that really relates to this question that we're talking about today is very late in the proceeding. The other continuances really all related to the other criminal case to which the government agreed it should be a continuance and the computer issue, which swirled in the background forever, which the district court never really took hold of. And the district court should have appointed a special master and didn't. I don't know that she ever really understood what was going on. Let me, as I run out of time here on my ---- let me go briefly to a couple of other points, which is, as I was reviewing the ---- for today, I realized that Mr. Mitha, who was one of the prosecution witnesses, testified that in December 1999, he went to a party and he met Mr. Sabir Bhatia. And I believe this was at, I think, 332 of the transcript. And, as you know, part of the basic claim against Mr. Bhatia is that he claimed that he was intimate with Mr. Sabir Bhatia, that Mr. Sabir Bhatia had this company known as Arzu, that Mr. Bhatia was going to take it public, and that he was ---- the investors were going to make millions of dollars because of Lal Bhatia's connection to Arzu. In December 1999, before a lot of these investments had been made, I mean, Mitha meets Mr. Sabir Bhatia, and Mr. Bhatia says, Lal Bhatia, I've never heard of him. And the question then is, okay, if he's never heard of the person who Lal Bhatia claims that he is intimate with and is the basis of this future fortune, then why doesn't everything stop at that point? Why aren't the other investors alerted? Why is this entire scheme not exposed at that point in time? And the only thing I can make of that is the fact that all these representations about Sabir Bhatia either didn't happen or they certainly happened in a very reduced form, because if one of the investors knew that there was no connection to him that early on ---- And presumably the jury could have so concluded, but it didn't. No, but the defense counsel never actually made anything of that point either. The other issue that I want to touch with briefly is the fact that it really deals with the defense counsel's failure to deal with the fundamental question of, could Mr. Bhatia have actually made these representations and could the investors have actually believed them? Mr. Bhatia had been living in Guam in Hawaii. He had obtained an MBA in Hawaii. He had lived there through the 1990s. The undisputed testimony from all of the investors was that Mr. Bhatia moved to the United States in 1999 and that they had had very little contact with him before then. From that we then proceed to Mr. Bhatia says that he knows Michael Dell and Bill Gates and Sabir Bhatia and all of his relatives say, that's great. Let me give you some money. There's just this fundamental question of could he have made such bald representations and could anybody have really believed that he made those representations or is that something that's just made up afterwards? But wasn't the jury instructed on the elements and as part of it they had to make that finding? Correct. But that really goes back to the IAC claim, which is defense counsel, these were obvious and glaring questions to be asked. What did the actress say and how could they have believed it and what did they do with the information that as of December 1999, at least one of the investors knew that there was no connection with Sabir Bhatia and it was never explored at trial. There is nothing indicating that any of the investors were really ever asked. When was the investment scheme for the most part? It's 1999 through 2000. It started, I believe, the first investments were about August 1999 and they continued through 2001 actually when I think the last money was paid. But also there are all these clearly fraudulent documents that he generated later. I think one could probably fairly interpret them in that way and I really think that absent any other explanation, the only one I can give the court is I think it's really guilt and shame that these are relatives, these are people who expected incredible returns that obviously weren't going to get them, and how do you deal with that? They didn't even get the money they had invested in some instances. Right. One got all his money back. Mitha actually made a small profit. The other people lost about half their money. But it's just, I think, this is my supposition, enormous shame, which within Indian culture is a very strong element that he had disappointed his relatives, that his relatives, two aunts, an uncle, and cousins had invested money with him. They had had great expectations. Those expectations had not come to fruition and he felt enormous shame. With that, I believe I have two minutes and eight seconds. Okay. Go ahead. Thank you very much. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan and I represent the United States in this appeal. I'd like to start off by addressing the computer claim, the evidentiary claim. The most disturbing thing about the computer issue is that the government was told not to do something and it didn't. And so from there on, why is it that, the fact that nothing was done about that that affected the trial is somewhat disturbing? Well, Your Honors, I think In other words, what I'm really questioning is whether the privilege issue is the whole problem. I mean, there's also the fact that the government was specifically told not to look at these documents and did. Or not to look at the, the prosecutor was not supposed to look at the computers and did. I think if you look at the December 12, 2005 transcript, what the district court ordered was a little bit ambiguous. I think an inference, a fair inference would be that the government shouldn't look at the computers. But in fact, that's not what the government, that's not what the court said. The court said that nothing on the privilege log was actually privileged and that therefore the defense had to turn over all the documents to the government. When the government found that there had been no correlation between the documents that were turned over and the way they were described in the privilege log, the government then, as it had always been above board, wrote a letter dated December 22, 2005 to the defense saying we don't see everything that is listed here. We suspect that not everything has been turned over and we intend to look at the computers. Did not look at the computers. Why didn't they just go to the judge and say that? Well, I think there was a misunderstanding perhaps of the intention, but it was all in good faith. I don't think, and I think part of the reason you can see that it was in good faith was that the district court, who was there overseeing all the proceedings, when finally notified on January 23 that the government had looked at the computers and the government never denied this at all. And initially the reaction was, so what? I said that nothing on the privilege log was privileged. So what was the problem? And only when it was gotten into greater detail, the court said, well, did you have a clean room person looking at it? And the government immediately said, no, we didn't. We thought that there was no need to look at that. And part of the confusion is because there was this other aspect. And this has to do with the readability of the files that defense counsel was talking about before. The government turned over all the computers. Those were nine computer components on May 26, 2005. Gave the defense chance after chance to work out the privilege issues without involving the court. After four letters, a letter each month, the defense hadn't returned or replied or done anything. And what all they had responded was that we can't look at three computers, three computer components. As it turned out, the government worked with the defense to try to work this out. One of the computers could be seen as soon as you booted it up with a power cord and a battery. The other two components were labeled QSFR-2 and QSFR-7. The government cooperated and had its expert, Donald See, take a look at those two computer components and found that they were unreadable. There was nothing that you could see about them. So those two were completely unreadable. And before we got to that point, however, when the defense was arguing about how they couldn't see this and the government volunteered to have somebody, no privilege logs had been made of those two computer components because the defense had not been able to look into those computers. So the district court then said, I'm going to order that you have a clean room person look at these because we don't know what's on them. There may be privileged materials. It's in a different position than the other computers which had been accessible, had been accessed, and had been claimed to be privileged and over which the district court had already found that there was nothing privileged over. So that's why there was some confusion. So did the government get back only the two computers that had a problem or not? The government had turned over all the computers. And I think what happened was that those two computers that were reviewed, those components, the forensic examiner examined forensic copies that had been made. So before all the computers were reviewed. But only those two computers? Only those two. The rest the defense had all along? The defense had all the computer components all along. I understand. But two of them didn't have no use to it because they couldn't read it. That's correct. That's correct. All right. So those two went back to the government and the government then reproduced them in some way that they were readable. Is that what happened? No. The government had forensic copies of all of the components before turning them back to the district court. I see. So the government's versions were readable? No. They were not readable. So if they weren't readable, then they couldn't have read them. If they couldn't have read them, then what's the privilege problem? Well, that was part of the reason why the district court found the defense to be dilatory in this whole computer and manufacturing this entire issue. They had all the computer components returned to them. They couldn't read the two, but they wouldn't concede that they couldn't read the two and said that somehow the government was hiding it or had done something to the computers. And furthermore, that they couldn't find any expert within the time period, within, you know, a month or two, who would be able to confirm this. So to try to resolve this, the government offered up its own expert, which the district court said had to be a cleanroom person. But what was the expert doing? The expert was trying to make these readable, no? No, just to confirm whether they were readable or not. I see. So it was a very basic question. And so what was it the government ultimately looked at? They couldn't look at those two because they weren't readable. So they looked at the other seven? That's right. That's right. So they looked at computers that the defense had already offered as privileged, that the district court already said that none of those documents were privileged. And so the government thought. But you didn't say that the claim that was being made was that the order in which things appeared was privileged. That's correct. And that's why the district court did order the government, as I understand it, to have only a certain agent and not the prosecutor look at it. I agree, Your Honor, that the government's practice probably should have been, had it understood the order correctly, to go to the court for an order. All right. So I don't understand the relevance of anything else you said. What's the point of it? Are you just – your point is simply that, yes, they had the computers and the documents weren't readable, but they claimed that the order of them was readable. So what? So what's the point? I guess I have three points. First is that the government, to start off with, didn't violate any order as it understood it, because the order that was given prior to the viewing of the computers was ambiguous. In fact, after December 22nd, when the government said it intended to look at the computers and told the defense this, the defense didn't raise anything. It was only a month later, on January 23rd, that this was raised with the court at all. Second – Counsel, let me ask you this. The order says – the order said that the forensic expert was to examine the computer components. And then the court said – ordered the FBI expert not to provide copies of the files to counsel for the United States Attorney's Office or any third party, nor discuss any of the contents of the file with counsel for the United States Attorney's Office or any third party. Is that the order you're saying was ambiguous? No. See, that's why I think that there is something confusing. That pertains to those two unreadable components. We have seven components that are readable. There's no dispute about them. The defense counsel had looked at them, made a privilege law regarding these seven computers, given them to the district court. The district court said there's nothing privileged about them. So there are two different issues. One is on the unreadable, and one was on the ones that were readable but claimed privileges. So there are two orders, right. So with respect to the seven computers, the district court said you have to turn those over if you don't want to – you don't have to tell them anything about what you thought about them, how you analyzed them, how you rated them, but you've got to turn those over. There's no privilege. Then there are these two computers that haven't been seen by anybody. But wait a minute. Just a minute. Yes. So my understanding is that what then happened is they turned over – they printed out and turned over all the documents, but in their own order. Is that not so? And this leads to my second – yes. And there was still the issue of looking at the actual computers, and there was an order relating to that because of this order issue. So the other two points that I wanted to make were that – But what was the order related to the computers that could be read, and where is that in the record? That's a great point, Your Honor. There's nothing in the record that says what order the computers actually had them  And the only proof that supposedly that there was some order that was of any significance are these charts that were submitted. Oh, no. We're using the word order in two different ways, and it's confusing us. Sorry. The court's order. The district court's order regarding the computers that were readable, what were any limitations that were placed, and where is that in the record? Your Honor, that was on December 12th, and I think you can find what the court said at the government excerpts at page 54. Okay? So the government said – didn't specifically mention anything about a clean room methodology. And I think the – what's also important is that the government didn't exhibit any bad faith, but in this situation, what happened was that the defense did. The defense clearly violated the court's order to turn over all the documents because the government found that one of the most damning documents, pieces of evidence, which was a piece of document that was a forged letter from Arzu, which was Sabir Batia's company, was found on the computers that was not turned over into hard copies. Ordinarily, when you have a discovery problem, when you think something hasn't been turned over that should have been turned over, then you either bring a contempt order or you go to the judge and say there's something that was supposed to turn over that didn't turn over. You don't go do self-help. Now, I don't know where all this leads to, if there really wasn't a privileged problem at all, but it's very disturbing. But certainly, Your Honor, although I would note that the district court was not disturbed by it, and the district court noted that there was nothing privileged there, that this seemed to all be a charade, and also said that to the extent that there was anything that could be shown to have been found that the government shouldn't have seen, it would consider suppressing it. Nothing was shown. I have another question. What is this facts and issues document that's referred to by the appellant? I couldn't understand that. Sure, Your Honor. So what this was, was a declaration was submitted on the first day of trial in support of the motion to suppress. Right. Accompanying that was two documents, two exhibits. One was a fact chronology and another one was an issue outline. Which were created at that point, not which were not on the computer all along or which were on the computer all along? Not on the computer at all, although the appellant says in his reply brief that they were on the computer. Who created the fact and chronology, fact chronology documents? I don't know, and the record doesn't support it. Because it says, it says confidential attorney work product, do not reproduce attorney client privilege on it. That's correct, Your Honor. I mean, I can only speculate that Ms. Kapoor or somebody on the defense team had created this. But there's nothing in the record that shows that this was ever on the computers or that it wasn't. It was provided. In fact, the declaration doesn't say it was on the computers. The declaration accompanying them specifically does not say that they were on the computers. And presumably it had been the computers, that it would have been privileged. Yes. And they would have either raised it in the many months of litigation about this. There's nothing in the record that shows how the government got this? How it got this document? The government, there was no contention that the government had this, Your Honor. The government was able to find it, put it in excerpts because I was combing through the record and I saw that there was a declaration with a sealed attachment to it, and I contacted Mr. Peters and asked him if he could give it to me. And then I attached it because I noticed that it hadn't been attached to the appellant's excerpts of records. No. And I thought it would be relevant to your consideration. So that's how the government got it. And I don't think anybody, well, actually I know from talking to trial counsel that nobody in the trial team ever saw that. And I think the other thing is if you look at that chart, even though it's privileged, it doesn't actually show anything about how the files were organized on the computers. It shows the significance that individual source documents, I suppose you would call it, were given by the defense, but nothing about how the documents were structured on the computers. And granted, I'm not particularly apt at computers, but I couldn't make any head or tail of it. And I don't. If this were a problem, presumably there would be a prejudice standard also, wouldn't there not? And the prejudice, as Mr. Peters just got up and said, was that they're saying that the government learned that their defense was that Abe was a legitimate business. Now, I think your Honors have pointed out that there are many ways the government could have deduced this anyway. But one of the most telling things, and this I unfortunately did not include in the defense strategy, is that the defense strategy said this in open court before the government and the court, that the reason he needed more time to look at the computers was because he wanted to show that Abe was a legitimate business and that was the defense strategy. He said this on October 24, 2005, and if you look at the transcript at page 8 on that date, you'll find that he says exactly that. Kagan. He wanted to show what? I'm sorry, I didn't hear you. He said that the defense strategy was to show that Abe was a legitimate business. Right. So that is the prejudice that Appellant has indicated comes from looking at these computers. So that's the only thing. And you're saying Rappaport announced that in open court earlier anyway. Exactly, way before. And also this witness list in terms of the revised witness list, another thing to note is that that revised witness list was submitted and filed over a week before the government agents ever looked at the computers. And I didn't get the timing exactly right and explicit in my brief, but if you go and you look at the government counsel's letter of January 20, 2006, which is at Excerpts of Record 307, you'll see that it says this week government agents or case agents looked at the computers and found this document. That's the week of January 16th. So it's a week after the January 4th revision of the witness list. I think I'd like to, if you have no more questions about the computer issue, talk a little bit about the counsel issue. Now, defendant says that because the district court failed to give him more of a continuance, he was deprived of his Sixth Amendment right to choice of counsel and effective counsel. And this is simply not borne out by the record. Mr. Bhatia went to trial with four attorneys, four separate attorneys of his own choosing, two of whom had been on the case from the very beginning. By his own admission just now, Ms. Kapoor was the one who had been looking and scouring the computer documents. So to the extent that the defense was rooted in the computer documents, she had the most knowledge. They had another attorney come on, Mr. Pori, who had a month and a half to prepare for trial. They also had numerous continuances. Now, this was February 13th was the fifth trial date. They had four separate continuances. And appellant counsel tries to characterize this as none of those continuances really mattered because they were by stipulation by the government or it was because there was a new indictment, a superseding indictment, or for the computer issue. But the very premise of those was so that the defense counsel could prepare, to prepare because they said that their defense was rooted in the computers, to prepare because there were new counts, to prepare, and they didn't do so. And so the district court found that their failure to prepare was dilatory. And I think there's a very good record to support the district court's finding of this. There's nothing in the whole computer dispute that really rings true. It seems really all a cover-up to hide this document, which is so damning, that showed that Mr. Abbatea had forged an ARZU letter in furtherance of his fraud. We know that Mr. Abbatea was out of custody, and so it was in his interest to postpone the proceedings. The privilege law didn't have anything that was actually privileged, despite hours and hours of dispute, months and months of delay. And then I think it's important also to note that of the attorneys that were brought up, Mr. Abbatea specifically said he wanted Mr. Porey. He chose him because he believed that he had plenty of criminal experience and that he was of Indian heritage so that he could understand his defense where somebody more experienced or somebody of a different ethnicity would not be able to. So I don't think there's really any question that he had his right to choice of counsel, and also the question of whether they were effective or not is something that should be deferred to a different day, as Your Honors pointed out. Earlier. Ginsburg. Presumably, one could also delay the continuance issue insofar as it's wrapped up with the ineffectiveness, because I suppose only if you first thought there was a violation, but the prejudice issue with regards to continuance would be tied up with the ineffectiveness. I think so. I think the continuance issue is looked at under a standard of review that's an abuse of discretion. And I think if you look at the TAM factors, the district court clearly didn't abuse its discretion. There was, I think, a very clear basis for finding that there was a lack of diligence. That's the first factor. There is no articulation of what the defendant needed more time to do. At least part of the explanation for the lack of diligence was the breakdown in communication. Right. But that was, I think, the district court found largely because Mr. Abbatea stopped providing information to Mr. Rappaport. He continued to find to provide information to Kapoor, Ms. Kapoor, who ended up taking over the case. And this is on top, this is at a very late date. This entire issue was brought up, I think, in late December, because Mr. Poirier was brought on on December 31st. The motion to withdraw was filed a few days after that. This was just a few weeks before the trial date at that point. The trial date was January 31st. And there was, in fact, some continuance at that point. There was. The trial was continued from January 17th to February 13th. So there was a continuance. It's just not the continuance that he wanted. He wanted 6 months. And the district court, I think, was within its discretion to say, no, that's not reasonable, particularly given that you have no reasons for why. I don't believe you because you've been dilatory in the past and I've shown bad faith that it's inconvenient to the court as well as the government and the witnesses, one of whom had to come from England and was a doctor who had to shuffle her schedule around. And that there's not going to be a reason for that. Just very quickly, actually, the issue that I found most confusing was this question about why Mr. Houser was not allowed to cross-examine a woman whose name I don't remember. Mr. Copolani. Mr. Copolani. That seemed like a strange order and resolution. I don't quite understand why it's the government's problem or the court's problem if the lawyer does the cross-examination. If he then wants to get up as a witness, then there might be a problem. But if he isn't at that point a witness, if he then wants to be a witness, the court can say, well, you can't be a witness, but why can they stop him from doing that? What's the basis for not allowing him to do the cross-examination? Well, under Manholt v. Reed, this Court said that really these precautionary actions should be taken, preemptive actions should be taken, so that somebody who might be a witness isn't then foreclosed from being a witness because But if the defense is willing to agree to that, it's the defense's problem. Why is the court's problem? And under Wheat, the Supreme Court said that the court may override that in its discretion as an arbiter. And I think in this case, what the court said was, I'm going to draw a compromise. The advocate witness rule says that normally you wouldn't be able to participate at all. I'm going to let you participate. You can help Mr. Pori prepare. But to avoid the possibility that you'll get up and basically present unsworn testimony by getting up yourself and contending that, no, you didn't write letters to Ms. Kerbalani defending Mr. Abbatea's actions, no, you didn't accuse her of any of that. Then if he starts to do that, you just stop him. It just seems like a very peculiar prophylactic rule. I think that that is the rule, however, and I think the district court drew an appropriate compromise there. I don't think the defendant was prejudiced at all. He was able to get up and give the closing argument, make numerous motions, prepare Mr. Pori, feed him pretty much questions for this witness. And to the extent that anybody might disagree with the district court, I still don't think that amounts to a finding that she abused her discretion. Thank you very much. We'll give you an extra minute and a half, because Ms. Chan took an extra minute and a half. Well, the fundamental issue is that the government was told not to look at the documents and it obviously did. And there's really no explanation for that other than the government chose to look at the documents and disregarded what had been told. So basically, so then the question is what's the review of that? I mean, you didn't exactly raise it that way, first of all. You raised it as a prosecutorial misconduct question, but you didn't really say what it was that the district court should have done about that. But in any event, doesn't the district court have a fair amount of discretion in terms of – it's really a sanction question at that point. If there was no privilege, then what we have is a sanction question. What should she have done as a sanction? And what's her level of review of that? I don't know that there would have been an effective sanction because the computer issue was so intermixed with everything else. I guess the only way that the defense perceived that they could address the issue was to request a dismissal for prosecutorial misconduct, which the district court declined to do. I think fundamentally how this entire process went is skewed, I think, is that this should have been referred to a special master who had some knowledge of computer issues and could have understood what was going on, because I don't think the district court ever did. Certainly the district court thought at one point in his comments that Mr. Boddy could just recreate what had been lost because he was a person who must have created it all, and that's simply not the case. But that's not the issue you're raising. You're not coming to us about what – I was wondering about that, but you're not coming to us about what was lost. No. Okay. So it's irrelevant. Well, it's not irrelevant. It really has to do, I guess, with the lack of preparation issue that we had counsel go to trial and not really be prepared because of the delay caused by the government losing defense documents. But it was lost. It wasn't found, and that was it. And if you wanted to raise an issue about that, you could have, but you didn't. That's true. I don't know that there could have been an effective remedy other than dismissal. If the government, in fact, looked at defense strategy, what do you do other than dismiss? Counsel, could I ask you to respond to opposing counsel's characterization of the orders as – district court orders as two different orders, one related to the unreadable files and one related to the computers that had information that could be read. And the one that said don't look at it related only to the unreadable files, and there was no similar order regarding the files that could be read. Do you agree with that? No, I don't. Because if that was true, then I don't think that Mr. Corrigan would have been called on the carpet, as I believe he was, for looking at the files. Because I remember an explicit dialogue in which the district court said that how could they have discovered the fact that there had been a document turned over if they had not looked at the computers, which they were supposed to do? Or is that in the record? I would have to – I could provide that by a letter I don't have in front of me at the moment because I obviously traveled here from Los Angeles and don't have everything with me. But that is in the record that – Well, you don't need to provide anything unless we ask you to. The district court certainly believed that Mr. Corrigan had been instructed not to look at any of the documents. And I just wanted to conclude with just a couple snippets from what was said by counsel on January 16th and January 23rd before the trial occurred as to the issue of whether – who had failed to prepare and whether Mr. Botnia should get tired with his attorney's failure to prepare and whether he did in fact have competent counsel to replace Mr. Rapoport after he was allowed to withdraw. And frankly, my opinion is Mr. Rapoport wanted to withdraw because he wasn't prepared. He had done nothing. He had gotten a massive agreement. He had done no work. And he wasn't prepared to try the case. And I think if anyone manufactured a dispute for him to get out, it was Mr. Rapoport. And this entire issue that he raises about a new issue that's been injected that he knows nothing about really relates to an issue that will surface somewhat at the trial is now the basis of a motion for new trial, motion to set aside the verdict in the underlying case and related to the prosecution witness, Krishnakirpalani's suppression of the grandfather's will. I'm sorry. I didn't hear that. I didn't hear what you said. The issue that Mr. Rapoport was referring to is this big issue that he was kept out of the loop on, really related to not to how to deal with what the prosecution witnesses were saying, but their motive and bias of relating to the Krishnakirpalani suppression of her father-in-law's grandfather's will. And that's an issue that's currently in the district court. It really had nothing to do with how he was preparing to deal with the prosecution witnesses other than the bias issue which was newly discovered. Okay. Thank you very much. I think we read the record. I'm sure I could probably quote the same things you're about to quote to us. So thank you very much.     Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Fletcher, Berzon, Rawlinson